UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUSAN SHEPPERSON,          )
                          )
          Plaintiff,       )    CIVIL ACTION NO.
                          )    16-12116-DPW
v.                        )
                          )
METROPOLITAN PROPERTY AND  )
CASUALTY INSURANCE CO.,    )
                          )
          Defendant.       )

MEMORANDUM AND ORDER
May 22, 2018

The question presented is whether Mass. Gen. Laws ch. 175,
§ 99 assures property damage coverage for an innocent named
insured when an unnamed co-insured resident of the premises they
share intentionally sets those insured premises afire.
Plaintiff Susan Shepperson, the named insured of the insurance
policy before me, seeks to establish that she is entitled to
coverage irrespective of whether the fire which damaged her
residence was caused by her son, who I find to be an unnamed co-
insured and also a resident of the premises.  Concluding that
the policy may not exclude coverage for Ms. Shepperson as an
innocent co-insured, I will grant her summary judgment
establishing the insurer's liability on her contract claim.

In reaching my conclusion that the insurer is liable on the
contract claim, I have followed a somewhat different path from
that pursued by Ms. Shepperson in her motion.  I conclude first

that by its plain terms, the policy does exclude coverage.  I

nevertheless also conclude that such an exclusion is barred

under Massachusetts law.  Once the illegal exclusion is excised

from the policy, Ms. Shepperson is entitled to coverage, so long

as she was innocent of involvement in the fire which caused the

injury for which she seeks damages.  I find she is an innocent

insured entitled to damages.  The amount of damages is not yet

ripe for resolution.  I will consequently look to the parties to

formulate a plan for resolving the issues that remain

outstanding following my grant of Ms. Shepperson's motion for

partial summary judgment so as to bring this case to final

judgment promptly.

## I. BACKGROUND

### A.  *Factual Background*

Ms. Shepperson is the sole owner of the residential

property located at 47 Larchmont Road in Salem, Massachusetts

("the premises").  She maintained a homeowner's insurance policy

("the policy") with Defendant, Metropolitan Property and

Casualty Insurance Co., identified as policy number 1190421841;

the policy coverage was effective July 13, 2015 to July 13,

2016.  The policy provided coverage for the premises.  Ms.

Shepperson is the sole named insured on the policy.

#### 1.  The Policy

The policy included, in relevant part, the following

language:

The terms of this policy impose joint obligations on all persons defined as **you**.  This means that the responsibilities, acts and failures to act of a person defined as **you** will be binding upon another person defined as **you**.

**"You"** and **"your"** mean:

1. the person or persons named in the Declarations and if a resident of the same household:

    A. the spouse of such person or persons;

    B. the relatives of either; or

    C. any other person under the age of twenty-one in the care of any of the above . . . .

### SECTION I – LOSSES WE COVER

(SPECIAL PERILS) . . .

**COVERAGE A – DWELLING AND COVERAGE B – PRIVATE STRUCTURES**

**We** will pay for sudden and accidental direct physical loss or damage to the property described in Coverages A and B, except as excluded in **SECTION I – LOSSES WE DO NOT COVER**.

**COVERAGE C – PERSONAL PROPERTY**

**We** will pay for sudden and accidental direct physical loss or damage to the property described in Coverage C when loss or damage is caused by **SECTION I – BROAD NAMED PERILS**, except as excluded in **SECTION I – LOSSES WE DO NOT COVER**.

## SECTION I – LOSSES WE DO NOT COVER

### (SPECIAL PERILS)

1. **We** do not insure under any Section I coverage for any loss which would not have happened in the absence of one or more of the following excluded events.  We do not insure for any such loss regardless of:

   (a) the cause of the excluded event;

   (b) other causes of the loss; or

   (c) whether such causes acted at the same time or in any other sequence with the excluded event to produce or contribute to the loss.

   These exclusions apply whether or not the excluded event results in widespread damage or affects a substantial area.  The excluded events are listed below.

   A. **Intentional Loss**, meaning any loss arising out of any intentional or criminal act committed:

      1. by **you** or at **your** direction; and

      2. with the intent to cause a loss.

      This exclusion applies regardless of whether **you** are actually charged with or convicted of a crime.

      In the event of such loss, no one defined as **you** or **your** is entitled to coverage, even people defined

as **you** or **your** who did not commit or conspire to commit the act causing the loss.

2.    The Incident and Claim History

On March 4, 2016, a fire caused significant damage to the premises and to the personal property contained within.  Ms. Shepperson made a report of the loss to Metropolitan the next day.  Metropolitan sent Ms. Shepperson a letter on March 7, 2016, acknowledging the receipt of her claim.

On March 9 and again on March 28, Metropolitan sent Ms. Shepperson a letter informing her of "a potential coverage problem for [her] recent claim."  Moreover, in accordance with its rights under the policy, Metropolitan requested that Ms. Shepperson cooperate with its investigation into the fire, provide an examination under oath, and produce pertinent documentation and information in support of her claim.  Her examination under oath was conducted on April 21, 2016.

Metropolitan also scheduled the examination under oath of Scott Shepperson, Ms. Shepperson's eldest son, for April 21, 2016.  This scheduled examination was the subject of notice provided in letters dated March 24, 2016 and March 31, 2016, sent to Scott at the premises and at 3 Whipple Street in Danvers, Massachusetts.[1]  When Scott failed to appear for his

---

[1]  3 Whipple Street, Danvers, Massachusetts, is the address where Ms. Shepperson and Scott were living after the fire.

scheduled examination under oath, Metropolitan notified Ms.
Shepperson's counsel that "Scott Shepperson qualifie[d] as 'you'
under the policy, and as such [wa]s obligated to cooperate with
Metropolitan's investigation and provide an examination under
oath[,]" and that until that was done Metropolitan could not
"make a final determination on the coverage available to [Ms.
Shepperson]."

> ### 3.   Ms. Shepperson's Examination Under Oath

In her examination under oath, Ms. Shepperson testified
that she owned the premises and that no one else had an
ownership interest in it on the date of the fire.  She said that
on the day of the fire no one other than she, Scott, and another
son Eric Shepperson, were living at the premises.  She testified
that she was not at home at the time of the fire because she,
along with her daughter, Beth DiSessa, and her two
granddaughters, traveled to Holyoke, Massachusetts to visit her
brother for the night.  Ms. Shepperson testified that Scott, who
was on a scheduled layoff from work at the time, however, was
home when the fire occurred.

Ms. Shepperson learned about the fire around 11:45 PM that
evening during a phone call from her neighbor.  When she spoke
to Scott that night, he told her that he "accidentally set the
house on fire" and that he was "so sorry."  Ms. Shepperson
testified that Scott told her he had noticed that the snow

blower needed gasoline so he filled the gas can, which was ordinarily kept in the garage, with gasoline and brought it inside the house. She said Scott had described to her that as he was walking through the house, he smelled gas and it appeared that the gas can was leaking. Ms. Shepperson further testified that Scott told her that "[h]e took a cigarette out of the package, put it in his mouth, walked through the back hall, took a kitchen match, lit the match and was walking out to the deck to light his cigarette . . . when he struck the match, . . . the place exploded."

When asked whether Scott had always lived at the house, or whether there was a period of time that he lived somewhere else, Ms. Shepperson responded, "No. When he was in college, he lived in Newport on campus. But that was many years ago." When asked, "But other than that, he's lived at the house?" she answered, "Yes."

On July 28, 2016, after the parties had exchanged several communications, Ms. Shepperson's counsel sent a demand letter to Metropolitan's legal counsel, pursuant to the provisions of Mass. Gen. Laws ch. 93A, alleging that Metropolitan's acts and failures to act violated the provisions of Mass. Gen. Laws ch. 176D and ch. 93A; the demand letter requested an offer of settlement within thirty days. In response, Metropolitan's legal counsel sent a letter to Ms. Shepperson's counsel

rejecting the demand.  A month later, Metropolitan issued a letter denying Ms. Shepperson's claim in its entirety.

### 4.  Scott's Deposition

Metropolitan conducted Scott's deposition in this case on April 4, 2017.  In that deposition, Scott described the premises as his "permanent address."  The premises address appeared on his driver's license.  He testified that, prior to March 4, 2016, he had never had an apartment or owned a house of his own.

Scott testified that he worked for DN Tanks and had been working for the company since 2007.  His job required him to travel to job sites all over the country.  He testified that he "basically lived in hotel rooms for the past ten years, nine years."  Because of the demands of his job, he effectively "live[d] out of a suitcase."

When he came back to Massachusetts from time to time he would either stay at the premises, at his sister Beth's house, at a hotel, or with friends.  Scott testified that he had his own bedroom at the premises.  He acknowledged that he did not exclusively use the bed in his bedroom at the premises, but that his "[u]ncles, family, cousins" did also.  He reported that the room was used "as a guestroom when [he was] not around."

Scott testified that "[s]ome of the clothes in [the dresser in the room] might have been [his]."  He said that he would leave some of the clothes he did not take with him on his work

8

trips in his closet. Scott testified that his mother would
"keep[] some of her stuff in the closet if she need[ed] room, if
her closet [wa]s full"; she would sometimes even store extra
blankets and pillows in the closet, he said. Scott testified
that although he kept some of his clothes at the premises, he
did not keep his toiletries in the bathroom of the premises,
rather he carried them in a travel bag and took them with him
wherever he would go.

Scott further testified that he used the premises for
purposes of mail for his official documents. The documents he
provided to Metropolitan's legal counsel all included the
premises as his address. For example, his motor vehicle's
Registry of Motor Vehicles form had the premises as both his
mailing address and his residential address. His motor
vehicle's registration also had his mailing address as the
premises. Notably, his motor vehicle insurance policy with
Metropolitan included the premises as his mailing address and he
confirmed that he did not have any other residential addresses.

Scott's 2014 and 2015 tax returns indicated his home
address as the premises. His 2016 W-2 forms also specified the
premises as his address. Scott confirmed that he did not have
any tax records that indicated that he lived somewhere other
than the premises. His credit card statements, Sprint bill, and
excise taxes for his motor vehicle all designated his address as

the premises.  Scott testified, however, that he paid his bills online.

Scott testified that, while he did not own the premises and that his mother did, he was not financially dependent on Ms. Shepperson.

## B.  *Procedural History*

Ms. Shepperson originally filed this action against Metropolitan in the Essex County Massachusetts Superior Court on September 26, 2016.  She alleged five counts against Metropolitan: (I) declaratory judgment, (II) unlawful invasion of privacy,[2] (III) breach of contract, (IV) infliction of emotional distress,[3] and (V) unfair or deceptive business practices under M.G.L. c. 176D, § 3 and M.G.L. c. 93A, § 2. Metropolitan removed the case to this court pursuant to 28 U.S.C. § 1446(a) on the grounds of diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a)(1).  Ms. Shepperson presses a motion for partial summary judgment on the declaratory judgment and breach of contract claims.  Metropolitan presses its own cross motion for summary judgment, but does not specify as to which counts.[4]

---

[2]  The privacy count was later dismissed pursuant to a stipulation in accordance with the provisions of Federal Rules of Civil Procedure Rule 41(a)(1)(ii).
[3]  The parties have not as yet sought action by the Court with respect to the emotional distress count.
[4]  Metropolitan has, however, indicated that it is not moving for

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." *Borges ex rel. S.M.B.W.* v. *Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." *Id.* at 5.

The movant "bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." *Id.* (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Once such a showing is made, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Id.* (citing *Celotex Corp.*, 477 U.S. at

---

summary judgment on Ms. Shepperson's G.L. ch. 93A, § 9 claim. In the absence of further specification, I will treat Metropolitan as pursuing a cross motion for summary judgment only as to the counts subject to Ms. Shepperson's partial motion for summary judgment.

324, 106 S. Ct. at 2553).  "[S]ummary judgment cannot
[, however,] be defeated by relying on improbable inferences,
conclusory allegations, or rank speculation."  *Ingram* v.
*Brink's, Inc.,* 414 F.3d 222, 229 (1st Cir. 2005).  "[T]he facts
are viewed in the light most favorable to the nonmovant . . .
and all reasonable inferences are drawn in the nonmovant's
favor."  *Id.* at 228.

It is settled that "[c]ross-motions for summary judgment do
not alter the basic Rule 56 standard, but rather simply require
[the court] to determine whether either of the parties deserves
judgment as a matter of law on facts that are not disputed."
*Adria Int'l Grp., Inc.* v. *Ferre Dev., Inc.*, 241 F.3d 103, 107
(1st Cir. 2001).  Consequently, "a court must rule on each
motion independently, deciding in each instance whether the
moving party has met its burden under Rule 56."  *Dan Barclay,
Inc.* v. *Stewart & Stevenson Servs.*, Inc., 761 F. Supp. 194, 197-
98 (D. Mass. 1991).

### III. ANALYSIS

Ms. Shepperson argues that her son, Scott, was not "a
resident of the same household" for insurance purposes, and that
she and Scott did not have a joint and nonseverable interest in
the policy.  She also argues that the provisions of Mass. Gen
Laws ch. 175, § 99 preclude a homeowner's insurer from declining
coverage to an innocent insured, such as her.  For its part,

12

Metropolitan contends that Scott was a "resident" of the premises covered by the policy and, under the policy definition of "you", was an unnamed insured on the policy. Metropolitan contends that Ms. Shepperson is not entitled to recover for damages caused by the March 4, 2016 fire if it is determined that Scott intentionally set the fire because under the policy no insured — whether named or unnamed — is entitled to coverage for an intentional loss even if they "did not commit or conspire to commit the act causing the loss."

Interpretation of "the language of an insurance contract is a question of law for the trial judge[.]" *Cody* v. *Conn. Gen. Life Ins. Co.,* 439 N.E.2d 234, 237 (Mass. 1982). "Like all contracts, if the language of an insurance policy is unambiguous, then . . . the words [are construed] 'in their usual and ordinary sense.'" *Boazova* v. *Safety Ins. Co.*, 968 N.E.2d 385, 390 (Mass. 2012) (quoting *Citation Ins. Co.* v. *Gomez*, 688 N.E.2d 951, 952 (Mass. 1998)). However, "if the contract is ambiguous, 'doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.'" *Cody*, 439 N.E.2d at 237 (quoting *August A. Busch & Co. of Mass., Inc.* v. *Liberty Mut. Ins. Co.*, 158 N.E.2d 351, 353 (Mass. 1959)). Furthermore, "[e]xclusions from coverage are to be strictly construed"

against the insurer.  *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 204
N.E.2d 273, 276 (Mass. 1965).

The burdens of proof regarding coverage shift depending
upon the nature of the provision at issue.  "An insured bears
the initial burden of proving that the claimed loss falls within
the coverage of the insurance policy."  *Boazova*, 968 N.E.2d at
390.  Once this initial burden is met, "the burden then shifts
to the insurer to show that a separate exclusion to coverage is
applicable to the particular circumstances of the case."  *Id.*
Lastly, "where the insured seeks to establish coverage through
an exception contained within an exclusion to coverage, the
burden shifts back to the insured to prove coverage for the
claimed loss."  *Id.*

A.   *Ms. Shepperson's Motion for Partial Summary Judgment*

Ms. Shepperson bears the initial burden of proving that a
loss within the coverage of the policy occurred, specifically,
she must show that her damages resulted from "sudden and
accidental direct physical loss or damage to the property."
Further, she must prove that the fire was not caused by someone
defined as "you" under the terms of the policy.  Ms. Shepperson
asserts that (1) she is the named insured on the policy, (2) the
policy provides coverage for loss caused by fire, unless
otherwise excluded, and (3) a fire occurred on March 4, 2016,
damaging the dwelling, rendering it uninhabitable, and causing

personal property loss.  These facts are undisputed for purposes of her motion for partial summary judgment.  Metropolitan, however, contends an exclusion is applicable for intentional loss caused by a relative of Ms. Shepperson resident at the premises.

### 1.    Resident of the Same Household

Ms. Shepperson contends that Scott is not an insured under the policy because he is neither a "resident" of the premises nor a member of her "household."  She characterizes Scott as "an independent adult who merely stayed at the [p]remises on occasion, but did not live there regularly so as to fairly be considered a member of her household."  Alternatively, Ms. Sheppperson contends more broadly that "[e]ven if Metropolitan were able to prove that Scott intentionally caused the [f]ire, his actions would have no bearing on [her] contractual right to coverage."

The central issue on this branch of her motion is whether Scott meets the definition of "you" or "your" as defined by the policy.  The policy outlines the terms as, "The person or persons named in the Declarations and if a resident of the same household: . . . The relatives of either . . . ."  Resolution of this question, through application of the facts, is a question of law.  *Vaiarella* v. *Hanover Ins. Co.*, 567 N.E.2d 916, 919 (Mass. 1991).

Unlike the terms "resident" and "household," the definition of "relative" is straightforward.  The term has been defined as "a person connected with another by blood or affinity."  *Andrade* v. *Aetna Life & Cas. Co.*, 617 N.E.2d 1015, 1017 (Mass. App. Ct. 1993) (quoting Black's Law Dictionary 1289 (6th ed. 1990)).  It is undisputed that Scott is Ms. Shepperson's son; therefore, he is her relative.

By contrast, "[t]he Supreme Judicial Court has held that because 'modern society presents an almost infinite variety of possible domestic situations and living arrangements, the term 'household member' can have no precise or inflexible meaning.'" *Metro. Prop. & Cas. Ins. Co.* v. *Morel*, 802 N.E.2d 592, 595 (Mass. App. Ct. 2004) (quoting *Vaiarella,* 567 N.E.2d at 920). "Consequently, determining whether someone is a member of a 'household' must 'proceed on a case-by-case basis with an evaluation and balancing of all relevant factors.'"  *Id.* (quoting *Vaiarella*, 567 N.E.2d at 920).

In *Morel*, the court noted that the inquiry into whether someone is a member of the same household is "more subtle" than "mechanical . . . particularly since, as the *Vaiarella* court noted, it is possible, in some circumstances, to have a residence in more than one place at the same time."  802 N.E.2d at 595.  As *Morel* observed, the *Vaiarella* court itself set forth several factors relevant for such a determination and "[a]mong

the nonexclusive factors mentioned . . . are whether the putative member of the household has an established connection to it; whether he receives mail at that address; whether he keeps possessions there; and whether his relationship to other household members involves financial support." *Id.* at 596. *See also Vermont Mut. Ins. Co.* v. *Stevens*, 882 N.E.2d 870 (Mass. 2008) (unpublished) (*Vaiarella* factors to be considered are: "(1) whether the individual has an established connection to the named insured's household; (2) whether the individual uses the same address as the named insured's household for perfunctory matters, such as receiving mail, registering a car, or on a driver's license; (3) in the case of an accident, whether the individual went to the named insured's household or to a different address after the accident; (4) whether the individual has a financially dependent relationship with the named insured; and (5) the subjective intent of the individual to become a member of the named insured's household.").

The question for the court in *Morel* was whether, at the time of the accident, the named insured's son resided in his father's household, even though the father lived apart from the family home, i.e. the insured premises. 802 N.E.2d at 594. When he was still in high school, the named insured's son intermittently lived on his own, with friends, or with his grandmother, but at some time before his accident he moved back

into the family home, the insured premises, to live with his
mother.  *Id.*  At the same time, the named insured remained
actively involved with his family at the insured premises, where
he was frequently present, and of which he was the co-owner.
*Id.* at 596.  The named insured received mail at the address,
performed substantial household tasks, and retained significant
financial responsibility for his wife and sons, including the
continued purchase of insurance for their benefit.  *Id.*  These
facts were held to establish the named insured's household at
the premises.  *Id.*  The *Morel* court found that "the only
remaining inquiry [wa]s whether, at the time of the accident,
[the son] was a relative residing there" and answered that he
"[u]nquestionably" was "since that was where he had lived,
received mail, and kept his belongings."  *Id.*  Consequently, the
court concluded that the named insured's son was an insured
under the policy.  *Id.* at 597.

A similar question was presented in *Vaiarella* where the
court determined a mother was not a member of her son's
household for the purpose of receiving underinsured motorist
coverage under her son's automobile insurance policy.
*Vaiarella,* 567 N.E.2d at 917.  She and her husband lived in a
mobile home in Florida for half of the year and in Brockton,
Massachusetts with their son for the other half of the year.
*Id.* at 918.  The mother and her husband were not financially

dependent on their son and her husband had registered the car in Florida and obtained a driver's license there. *Id.* They received mail both at their Florida home and at their daughter's home in East Boston. *Id.* While driving from Florida to Massachusetts, the mother was involved in an automobile accident in which her husband was killed. *Id.*

The *Vaiarella* court concluded that the mother only spent roughly four months living with her son before moving to Florida and prior to that, had maintained a separate household for over forty years. 567 N.E.2d at 919. "The plaintiff's claim to membership in her son's household [wa]s based almost entirely on future intentions and not on an established arrangement to which she was returning." *Id.* at 919-20. The court noted that the mother and her husband did not receive any mail at their son's home. *Id.* at 920. The Florida license and car registration were also considered factors. *Id.* Moreover, the court noted that the mother returned to her daughter's home after the accident, not to her son's. *Id.* More ambiguously, the court determined that the mother did not depend on her son for financial support. *Id.* The court reasoned that "[i]t is normally to be expected that, when one member of a family provides financially for other members of the family, that person will also provide insurance coverage for those other members of the family." *Id.* While it is true that economic

dependence is of significance in such a context, it remains only one factor in a multi-factor analysis.

In the record before me, Ms. Shepperson has explained that Scott lived at the premises, except for when he was in college. Scott corroborated this explanation when he testified that the premises was his "permanent address," the same address that appeared on his driver's license. While Scott testified that when he came back to Massachusetts sometimes he would either stay at the premises, at his sister Beth's house, at a hotel, or with friends, it is important to note that at the time of the fire, he was following his usual practice while in Massachusetts of living with his mother at the premises. Furthermore, unlike in *Vaiarella* where the mother was not returning to a household where she had long been a member, Scott remained a putative member of his mother's household because he did not have his own household.

Although Scott may not have had an exclusive room at the premises, since other family members would often stay in the room when they were visiting and he was not present, he did have a room that he considered as his own. He kept some of his clothes that he did not take with him on his work trips at the premises.

Scott also used the premises for purposes of mail for his official documents. Notably, his own motor vehicle insurance

policy with Metropolitan included the premises as his mailing address.

To be sure, in *Straker* v. *Commerce Ins. Co.,* 811 N.E.2d 525 (Mass. App. Ct. 2004) (unpublished), a son did not qualify as insured under his mother's policy because he used his mother's address only as the equivalent of a post office box because he moved frequently. But in *Straker* the son had other apartments he moved among. Scott had no such practice. Similarly, I recognize that in *Holyoke Mut. Ins. Co.* v. *Carr*, 546 A.2d 1070, 1071 (N.H. 1988), the son was held not insured under his father's policy as a resident of his father's household for insurance coverage purposes, despite his association with his parents' residence, listing his parents' address on his driver's license, visiting his parents frequently, and continuing to receive mail at his parents' home. What differentiates Scott's circumstances from those cases is that Scott had not procured an apartment elsewhere.

In *Vermont Mut. Ins. Co.* v. *Stevens*, 882 N.E.2d 870 (Mass. 2008) (unpublished), the court concluded that the son's financial independence of his parents for living expenses weighed in favor of concluding that he was not a "resident" under the policy. Similarly here, Scott testified that he was not financially dependent on Ms. Shepperson. Scott, however, also testified that he did not pay rent at the premises; thus,

his mother was financially supporting him (to some degree) by providing housing allowing him to live rent-free at the one location he could, his home.

Scott's travel requirements for his job introduce a variable into the equation for calculating whether he is a resident of the same household as Ms. Shepperson. In its opposition, Metropolitan contends that Ms. Shepperson points to no other residence, in the world, that could be considered Scott's "residence" at the time of the fire. Metropolitan states that Scott has never owned property in his life, and, other than for less than two years when he was in college, has never had anything approximating a residence other than the insured premises. There is considerable merit to this argument. The cases that Ms. Shepperson has included in her memorandum of law in support of her partial summary judgment motion involve more than one viable premise where the party could be a resident. Here, the only other "residences" that Scott can point to are the motels and hotels where he stayed when he was on the road working. Scott explained that due to the demands of his job, he effectively "live[d] out of a suitcase."

*Allstate Ins. Co.* v. *Patterson*, 344 S.E.2d 890 (Va. 1986), also speaks to this issue. There the son was not insured under his father's policy because of the "erratic nature of his residential contacts with his father's household." *Id.* at 893.

The *Patterson* court concluded that "[f]rom the time [the son] became a member of the Renegades [motorcycle gang] until the moment of the accident, he led an existence best described as nomadic, with no regular place of residence, either at his parents' home or elsewhere." *Id.* Unlike Scott's situation, the son in *Patterson* had specific places, the Renegades' clubhouses, where he would stay. Scott, on the other hand, would stay at hotels and motels, premises designed specifically for unaffiliated transients.

After taking all of the factors into consideration and weighing them *inter sese*, I find that the totality of the factors fully establishes that Scott was a resident of the premises under any current and common sense definition of that term. Consequently, in the absence of some supervening legal principles, the policy by its terms would provide no coverage for Ms. Shepperson.

### 2. Innocent Co-insured & M.G.L. c. 175, § 99

Ms. Shepperson contends alternatively that even if Scott were considered an insured under the policy, any intentional acts which he may have committed would not preclude recovery by an innocent insured, such as herself. Specifically, she claims that "[t]o the extent that the language of the [p]olicy purports to exclude coverage for an innocent insured for a loss caused by the intentional acts of another insured, it is inconsistent with

the scope of coverage afforded by the standard fire policy dictated by statute in M.G.L. c. 175, § 99, and must therefore be deemed unenforceable as a matter of law."

The legislative development of § 99 is important. "By St.1951, ch. 478, Massachusetts adopted a statutory policy based upon what is known in the insurance field as the 'standard policy', a form originally adopted in New York in 1943." *In-Towne Rest. Corp.* v. *Aetna Cas. & Sur. Co.,* 402 N.E.2d 1385, 1389 (Mass. App. Ct. 1980). The statute, in relevant part, provides:

> No company shall issue policies or contracts which, . . . insure against loss or damage by fire . . . to property or interests in the commonwealth, other than those of the standard forms herein set forth [inapplicable exceptions omitted]. G.L. c. 175, § 99.

Ms. Shepperson claims that the provisions of M.G.L. c. 175, § 99 prescribe a statutory form for fire insurance policies. She maintains that because of this statute, Metropolitan may not limit coverage for fire damage beyond what is permitted by the statute. Ms. Shepperson further contends that Scott did not have a joint and nonseverable interest in the policy and that Metropolitan's reliance on *Kosior* v. *Cont'l Ins. Co.*, 13 N.E.2d 423 (Mass. 1938), is misplaced.

At the outset, I must determine whether the 1938 *Kosior* decision survived the 1951 modification of Mass. Gen. Laws ch. 175, § 99. The court in *Kosior* held that the policy at issue

was joint and that the innocent co-insured could not recover because of her husband's intentional act of burning the insured buildings. 13 N.E.2d at 425. The decision acknowledged the standard form of fire insurance policy provided by Mass. Gen. Laws ch. 175, § 99, in its pre-1951 form. *Id.* at 424. The *Kosior* court qualified its acknowledgment by noting that "[e]ach party to a contract of insurance is entitled to have it interpreted according to the words used." *Id.*

Mass. Gen. Laws ch. 175, § 99 does not unambiguously reference an innocent co-insured's coverage under the standard policy, nor does it concern itself with joint interests in insurance policies. Consequently, it is appropriate to conclude that *Kosior*'s narrow holding, finding the innocent co-insured could not recover due to the joint nature of the policy, survived the 1951 modification of Mass. Gen. Laws ch. 175, § 99. *Kosior* and the statute coexist.

The Supreme Judicial Court has not explicitly overruled, or otherwise refined *Kosior*, although, the issue has been raised. *See Baker* v. *Commercial Union Ins. Co.*, 416 N.E.2d 187, 190 n.9 (Mass. 1981) ("[W]e do not reach the issue whether the rule that an innocent insured is barred from recovery by the intentional burning of the property by another insured is still sound policy."); *USF Ins. Co.* v. *Langlois*, 12 N.E.3d 1034, 1037 (Mass. App. Ct. 2014) ("We do not address the defendants' argument

regarding the Massachusetts standard form policy because this issue was raised for the first time on appeal and therefore is deemed waived.").

When the issue was raised in federal court in *Yerardi* v. *Pacific Indem. Co.*, 436 F. Supp. 2d 223, 247 (D. Mass. 2006), Magistrate Judge Dein also declined to address the issue and reiterated that the Massachusetts courts have not reassessed whether the rule set forth in *Kosior* "that an innocent insured is barred from recovery by the intentional burning of the property by another insured is still sound policy." She nevertheless concluded that the holding in *Kosior* "has remained the state of the law in Massachusetts, despite the fact that other jurisdictions now diverge from this construction." *Id.* at 248 (quoting *Courtney* v. *The Commerce Ins. Co.,* 1993 WL 818906, at *2 (Mass. Supp. Aug. 27, 1993)).

This is a less than fully developed area of Massachusetts state law that must be evaluated with care, caution and deference. "[A] federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." *Ticketmaster-New York, Inc.* v. *Alioto*, 26 F.3d 201, 204 (1st Cir. 1994). Moreover, "[i]t bears noting that only one Massachusetts court, the Supreme Judicial Court, may definitively prescribe binding rules of decision on matters of Massachusetts law" for both state courts and federal courts

sitting in diversity. *Vertex Surgical, Inc.* v. *Paradigm Biodevices*, *Inc.,* 648 F. Supp. 2d 226, 231 n.2 (D. Mass. 2009). If the Supreme Judicial Court has not had the opportunity to speak on the issue, "the federal court must make an informed prophecy as to the state court's likely stance." *Id.* (quoting *Andrew Robinson Int'l, Inc.* v. *Hartford Fire Ins. Co.,* 547 F.3d 48, 51 (1st Cir. 2008)). Lower state court decisions are not binding although they may provide guidance to the federal court, and are entitled to some weight. *Id.* Therefore, federal courts sitting in diversity take on a role similar to that of the lower state courts in the "articulation and application of state law on issues not directly and authoritatively addressed by the SJC." *Id.*

Ultimately, the question before me is what would the Supreme Judicial Court do if this case was before it? *Cf. Icenhour* v. *Cont'l Ins. Co.*, 365 F. Supp. 2d 743, 748 (S.D. W. Va. 2004) ("Inasmuch as there is no controlling authority, the court must forecast how the supreme court of appeals would treat the exclusion at issue in this case vis-a-vis the Standard Policy."). It is necessary for me to forecast what the state of the law in Massachusetts is. In this connection, however, it does not escape me that Metropolitan removed this case from state Superior Court to federal District Court but is now suggesting that I should not consider the current scope of

coverage for innocent co-insureds under developing Massachusetts law as articulated recently by two state Superior Court judges. The Defendant cannot use removal to escape confrontation with that developing state law.[5]

---

[5] I recognize that "[f]ederal courts faced with a determinative legal issue that is close or difficult, where no controlling Supreme Judicial Court precedent exists and policy issues of general applicability are implicated, may certify questions to the Supreme Judicial Court." *Vertex Surgical, Inc.,* 648 F. Supp. 2d at 231 n.3. The First Circuit has directed that "[b]efore this discretionary decision is even considered, however, [the federal court] must first undertake [its] own prediction of state law for [it] may conclude that 'the course [the] state court [ ] would take is reasonably clear.'" *Nieves* v. *Univ. of Puerto Rico,* 7 F.3d 270, 274-75 (quoting *Porter* v. *Nutter,* 913 F.2d 37, 41 n.4 (1st Cir. 1990)). In performing this undertaking, "the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the highest court would rule." *Losacco* v. *F.D. Rich Constr. Co., Inc.,* 992 F.2d 382, 384 (1st Cir. 1993).

The First Circuit when confronted with a similar circumstance as is before me, characterized the defendant's "effort to cram this square peg of a diversity case into a round state-law hole [a]s particularly disconcerting under the circumstances . . . ." *Putnam Resources* v. *Pateman*, 958 F.2d 448, 470 n.25 (1st Cir. 1992). The court emphasized that "[i]t was [the defendant] which chose a federal forum, electing to bring suit against [the plaintiff's insurance broker] in Rhode Island's federal district court instead of suing in a New York state court[,]" *id.*, and then observed "[w]e are reminded once again 'that litigants who reject a state forum in order to bring suit in federal court under diversity jurisdiction cannot expect that new trails will be blazed.'" *Id.* (quoting *Ryan* v. *Royal Ins. Co. of Am.,* 916 F.2d 731, 744 (1st Cir. 1990)). Metropolitan, a sophisticated litigant that has rejected a state forum — perhaps because analogous Massachusetts Superior Court decisions in *Hall* v. *Preferred Mut. Ins. Co.*, No. HDCV201400781, 2015 WL 4511760, at *3 (Mass. Supp. May 1, 2015) and *Liberty Mut. Ins. Co.* v. *Gonzalez*, No. ESCV20151794B, 2017 WL 3080565, at *4 (Mass. Supp. June 12, 2017), have evidenced an unwillingness to embrace its theory of innocent insured

28

It is undisputed that several jurisdictions, other than
Massachusetts, have addressed the language of the Standard
Policy by closely analyzing the distinction between the terms
"a(ny) insured" and "the insured," and have taken the view that
an innocent co-insured should not be barred from coverage. *See*
*Streit* v. *Metro. Cas. Ins. Co.*, 863 F.3d 770, 773-74 (7th Cir.
2017) ("The term 'the insured' is not defined in the Standard
Fire Policy.  But as noted by many states interpreting identical
language, the inclusion of the word 'the' as opposed to 'an'
serves as a limitation."); *Icenhour*, 365 F. Supp. 2d at 750, 751
("The overwhelming number of courts confronting the issue have
held there is a significant distinction between a standard
policy's use of 'the insured[,]' and the typical fire insurance
policy's use of the phrases 'an insured' . . . in a coverage
exclusion . . . .  [Therefore,] [t]he Standard Policy exclusion,
as construed, permits an innocent co-insured to recover policy
proceeds even when a fellow insured engages in arson that
destroys the insured property and premises."); *Century-Nat'l*

---

exclusion, *see infra* 31-33 — sought a different court system to
pursue its theory.  As the First Circuit has held to be the
proper course, I now undertake my own prediction of state law by
referring to "analogous decisions, considered dicta, scholarly
works, or other reliable sources to ascertain how the highest
court would rule." *Losacco,* 992 F.2d at 384.  I do not find it
necessary in making that prediction under the circumstances to
resort to certification, with its attendant delay and needless
imposition on the resources of the Supreme Judicial Court.

*Ins. Co.* v. *Garcia*, 246 P.3d 621, 624 (Cal. 2011) ("unlike

policy exclusions that refer to 'an' insured or 'any' insured,

exclusions based on acts of 'the' insured are construed as not

barring coverage for innocent coinsureds"); *Trinity Universal*

*Ins. Co.* v. *Kirsling*, 73 P.3d 102, 106 (Idaho 2003) ("The great

weight of persuasive authority shows that courts have found

language referring to 'the insured,' such as that found in the

standard policy exemptions, provides coverage to an innocent co-

insured . . . .  We too hold that the language of the standard

policy provides coverage for an innocent co-insured."); *Watson*

v. *United Servs. Auto. Ass'n*, 566 N.W.2d 683, 691 (Minn. 1997)

("the legislature's use of 'the insured' in the Minnesota

standard fire insurance policy evinces a general intent to

compensate an innocent co-insured spouse despite the intentional

acts of the other insured spouse."); *Lane* v. *Sec. Mut. Ins. Co.*,

747 N.E.2d 1270, 1272 (N.Y. 2001) ("Through use of the language

'the insured' in the standard policy, the statute delineates

independent liabilities and obligations as to each insured to

refrain from incendiary acts."); *Nangle* v. *Farmers Ins. Co. of*

*Ariz.*, 73 P.3d 1252, 1257 (Ariz. Ct. App. 2003) ("The increased

hazard provision in Arizona's Standard Policy, by using the term

'the insured' rather than 'any insured' or 'an insured,'

evidences an intent to allow recovery by innocent coinsureds.").

While it is prudent to be in alignment with other jurisdictions interpreting the Standard Policy, Massachusetts would not be bound by their decisions. Nevertheless, when reviewing standard policy provisions, the Supreme Judicial Court has expressed an interest "in giving § 99 the same treatment that is given to identical language in policies issued in other States." *Pappas Enters., Inc.* v. *Commerce & Indus. Ins. Co.*, 661 N.E.2d 81, 83 (Mass. 1996).

To be sure, Magistrate Judge Dein was correct in her 2006 *Yerardi* decision when noting that "Massachusetts courts ha[d] not considered whether the legislature's use of the term 'the insured' demonstrate[d] an intent to apply the policy exclusions only to a specific insured who ha[d] engaged in misconduct and not to innocent insureds." 436 F. Supp. 2d at 250. That, however, is no longer the case; the issue has been addressed more recently by two thoughtful Superior Court decisions.

In *Hall* v. *Preferred Mut. Ins. Co.*, No. HDCV201400781, 2015 WL 4511760, at *3 (Mass. Supp. May 1, 2015), Judge Ferrara noted that insurers may not limit coverage for fire damage beyond what was permitted by the statute. He examined the language of the standard policy as well as the relevant statutory scheme to determine whether the insurer could exclude coverage. *Id.* He found that the Legislature intended the term to be bounded by its deliberate use of "the insured" in lieu of a more inclusive

term, such as "any insured," or a more restrictive term, such as "named insured." *Id.* at *6. He concluded that the innocent co-insureds were entitled to coverage under the insurance policy. *Id.* at *7. Judge Ferrara, of course, was parsing policy language somewhat different from that before me, but it is apparent his analysis was influenced by the developing consensus that an innocent insured may not be deprived of coverage under these circumstances.

In *Liberty Mut. Ins. Co.* v. *Gonzalez*, No. ESCV20151794B, 2017 WL 3080565, at *4 (Mass. Supp. June 12, 2017), the insured argued that if the policy was interpreted to bar coverage for an innocent co-insured, it must be reformed to provide the level of coverage allowed for by M.G.L. c. 175, § 99, which he claimed allowed recovery by an innocent co-insured. Judge Lang reviewed appellate authority in other states and noted that he was "satisfied that, although not unanimous, the overwhelming weight of appellate authority in other states addressing the very issue presented . . . support[ed] [the insured's] position." *Id.* at *6. Consequently, he adopted the reasoning of those other courts and held that the insured was entitled to judgment as a matter of law that the policy covered the loss. *Id.*

Focusing on the facts before me and considering carefully what the Supreme Judicial Court would be expected to do, I predict that the SJC would conclude that M.G.L. c. 175, § 99

provides coverage for innocent co-insureds in these circumstances. Needless to say, there has been substantial development in this area of the law since the Supreme Judicial Court's 1981 decision in *Baker* to refrain from addressing the issue whether a broad reading of *Kosior* is sound policy. 416 N.E.2d at 190 n.9. The clear trend has been in favor of allowing innocent co-insured coverage. I see no reason why the Supreme Judicial Court would not join in the reasoning of its sister jurisdictions, especially when it has expressed an interest "in giving § 99 the same treatment that is given to identical language in policies issued in other States." *Pappas Enters., Inc.,* 661 N.E.2d at 83. In this connection, I find both *Hall* and *Gonzalez* to be persuasive as expressions of current Massachusetts law.[6]

The language of the policy here states that "no one defined as **you** or **your** is entitled to coverage, even people defined as **you** or **your** who did not commit or conspire to commit the act

---

[6] I note that the insurance defendants in *Hall* and *Gonzalez* chose not to pursue to the Supreme Judicial Court the question of whether their policies could exclude innocent insureds. The *Hall* court reported its decision for review, and it was taken up by the Supreme Judicial Court for direct appellate review. *See Hall* v. *Preferred Mut. Ins. Co.*, No. HDCV201400781, 2015 WL 4511760 (Mass. Supp. May 1, 2015), *appeal docketed*, No. SJC-11922 (Mass. July 30, 2015). However, the case was thereafter dismissed based on a stipulation between the parties. The *Gonzalez* case was also apparently resolved without appellate review.

causing the loss." This language is clear and unambiguous. The provision suspends coverage for all insured parties — even those who were innocent of any wrongdoing — when any insured party causes an intentional loss. The gravamen of the issue on this branch of the motion, however, is not whether the policy language is clear, but rather whether the policy provision complies with the mandate of M.G.L. c. 175, § 99. I conclude the exclusion, while clearly expressed, appears prohibited in this circumstance by § 99. Accordingly, Ms. Shepperson, if found to be innocent of causing the fire to her premises, would presumably be able to recover under the policy.

### B. *Metropolitan's Motion for Partial Summary Judgment*

At this point in my analysis, I have agreed with Metropolitan's contention that Scott was an unnamed co-insured on the policy. From this premise, Metropolitan relying on *Kosior* — which I have observed, *see supra* at 25, can coexist with § 99 — argues that if Scott intentionally set the fire, it has no obligation to make insurance benefits payments to or for Ms. Shepperson under the policy for the fire.

In essence, Metropolitan contends that Ms. Shepperson cannot be covered under an innocent co-insured theory because her interests and Scott's interests in the policy are necessarily joint and nonseverable. Metropolitan's heavy reliance on *Kosior* is the foundation for its contention that

because "Scott qualifies as 'you' for purposes of the intentional or criminal acts exclusion, . . . his obligation to avoid intentionally damaging the insured premises was joint with [Ms.] Shepperson's."  I view this contention as a leap too far.

In *Kosior*, both co-insureds were named parties to the policy allowing for their readily apparent joint interests.  As my colleague Judge Hillman observed when serving on the Massachusetts Superior Court, "the determination of the question whether an innocent coinsured may recover on fire insurance after another coinsured has intentionally burned the covered property ordinarily depends upon whether the interests of the coinsured are joint or severable . . . .  In the instant case, the obligation to refrain from intentional loss is a joint obligation, as it applies to loss caused by any *named* [insured]."  *Theriault* v. *Mut. Fire Ins. Co*, No. 960074, 1999 WL 791926, at *2 (Mass. Supp. Aug. 27, 1999) (emphasis supplied). Here, Scott was not a named insured.  Metropolitan relies upon case law where the policy expressly names both the innocent insured and the putative wrongdoer as insureds.  It has not provided authority where the putative wrongdoer has been found to hold a joint interest in the policy as an unnamed insured under the policy, such that it precludes an innocent insured's coverage under the policy.  Metropolitan has also failed to adduce any evidence to establish that Ms. Shepperson and Scott

have a joint and nonseverable interest in the policy. In fact, the two plainly have separate interests in what they can claim under the policy.

The alignment of named insureds, who jointly agree to an insurance policy, may justify holding each named insured responsible for the acts of the other. Such an alignment does not exist between a named insured and an unnamed insured sufficient to find the named insured, without more, jointly and severally responsible for any insurance loss of which she is innocent.

Metropolitan contends that M.G.L. c. 175, § 99 does not define the term "the insured" and thus does not restrict how it may be contractually defined. As explained in Section III.A.2. of this memorandum and order, the general trend has been in favor of allowing innocent co-insured coverage, regardless of the standard policy's absence of the definition for "the insured." Accordingly, Ms. Shepperson, if found that she is innocent of causing the loss, would be able to recover under the policy because of the consensus, which I find to have been adopted in Massachusetts, supporting coverage for an innocent co-insured.

## C.    *Ms. Shepperson's Established Innocence*

Given the legal rulings I have made to this point, I now turn to focus analysis on whether Ms. Shepperson is an innocent

co-insured as a matter of law who can recover under the policy, despite the purported exclusion.  While not extensively briefed by the parties, the innocent owner issue as to Ms. Shepperson herself has been adequately presented to me.

I find no evidence in the record — whether offered by Metropolitan, or otherwise — to suggest that Ms. Shepperson herself committed, directed, or conspired in any intentional or criminal act to cause the fire.

To be sure, in opposition to Ms. Shepperson's motion, Metropolitan, in a footnote, observes that when Scott was asked at his deposition whether he told Ms. Shepperson that he was going to set the fire before doing so, Scott asserted his constitutional rights against self-incrimination.  Metropolitan states that under Massachusetts law, I may draw a negative inference against Ms. Shepperson under those circumstances.  In *Lentz* v. *Metropolitan Property and Casualty Insurance Co.*, the SJC used the factors outlined in *LiButti* v. *United States,* 107 F.3d 110 (2d Cir. 1997) to determine whether to admit a nonparty's invocation of the privilege substantively.  768 N.E.2d at 542-43.  The court found that the defendant there had introduced sufficient evidence to establish a joint venture between the plaintiff and the two nonparty witnesses who invoked their privileges against self-incrimination.  768 N.E.2d at 543.

The *Lentz* court stated that "[i]n criminal cases, each member of a joint venture is deemed to be the agent of the other when acting in furtherance of the common objective . . . [and concluded that] [t]here is no reason why the same principle should not apply in civil cases." *Id.* Because of the relationship between the parties and this principle, the court found that "a jury could reasonably infer that invocations of the privilege [by the nonparty witnesses] in the circumstances were made on [the plaintiff's] behalf, rather than mere personal invocations of their right not to testify." *Id.* Nonetheless, the court emphasized that "the jury need only be instructed that they are permitted, but not required, to draw an inference adverse to a party from a witness's invocation of the privilege against self-incrimination, and that they should not draw such an inference if they find that the witness invoked the privilege for reasons unrelated to the case on trial." *Id.* at 545. Ultimately, the *Lentz* court concluded that the lower court judge's decision was not erroneous because the defendant provided sufficient evidence to establish a joint venture between the plaintiff and the two nonparty witnesses

Metropolitan has not met the *Lentz* predicate here. There is no evidence to establish a joint venture between Ms. Shepperson and her son, Scott, sufficient to draw an unfavorable inference against Ms. Shepperson based on Scott's invocation of

his privilege against self-incrimination.  Unlike in *Lentz*, the record makes clear Ms. Shepperson was entirely unaware of Scott's incendiary activities and did not endorse them directly or by implication.

By contrast to Metropolitan, Ms. Shepperson has actually provided evidence not turning on some strained construct of adverse inference regarding the question of her innocence.  The record shows Ms. Shepperson was away from the insured premises at the time of the fire and that she had no involvement in causing the fire.  Metropolitan has adduced no evidence to suggest otherwise and did not even bother to ask about her involvement during her examination under oath.  In fact, Ms. Shepperson testified during her examination under oath that Scott told her that he accidently caused the fire.  Whether Scott's actions that resulted in the fire were accidental or intentional is of no consequence to Ms. Shepperson's claim, given her own lack of involvement in the fire and consequent lack of any intent, actual or constructive, to cause it.

The record before me establishes as a matter of law that Ms. Shepperson is an innocent insured.  Metropolitan has not contested this issue sufficiently to identify a genuine issue of material fact.  Accordingly, I will grant Ms. Shepperson's motion for summary judgment with respect to Metropolitan's liability as to Count Three, her breach of contract claim.  The

correlative effect is also to grant summary judgment of Count I, Ms. Shepperson's request for a declaratory judgment on the issue.

**D.  *Chapter 93A Claim***

Although Metropolitan has not expressly moved for summary judgment on Chapter 93A, §9 claim made in Count V of Ms. Shepperson's Complaint, it maintains that "[t]he very existence of the legal debate [Ms.] Shepperson asked this Honorable Court to join militates in favor of dismissal of her c. 93A, §9 claim." Metropolitan's argument appears persuasive at this point in the litigation.

In *Peterborough Oil Co*. v. *Great Am. Ins. Co*., 397 F. Supp. 2d 230, 244 (D. Mass. 2005) (citing *Polaroid Corp*., 610 N.E.2d at 916), Judge Saylor noted that "[i]f [the defendant insurance company] improperly denied coverage but its disclaimer was based on a reasonable or plausible interpretation of the policy, it did not violate chapter 93A." Similarly here, Metropolitan's interpretation of the scope of *Kosior*, while erroneous, was not unreasonable or implausible. Under the circumstances, Ms. Shepperson will have great difficulty demonstrating Metropolitan's decision to litigate this matter to this point was an unfair or deceptive business practice within the meaning of ch. 176D or ch. 93A.

### E. Emotional Distress Claim

Neither party has as yet addressed the emotional distress claim made in Count IV of Ms. Shepperson's Complaint. As with the Chapter 93A claim, this claim does not appear promising for Ms. Shepperson at this point in the litigation. I share the views expressed by Magistrate Judge Dein in *Yerardi* regarding such a claim in the insurance coverage context. *Yerardi*, 436 F. Supp. 2d at 244-45. Nothing in the record of which I am now aware suggests Ms. Shepperson will be able to establish all the elements either of intentional or negligent infliction of emotional distress.

### IV. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Ms. Shepperson's motion [Dkt. No. 25] for partial summary judgment is GRANTED to the degree that she has established Metropolitan is liable for breach of contract, as claimed in Count III, and that she is entitled to a declaratory judgment so holding, as claimed in Count I. For the same reasons Metropolitan's motion [Dkt. No. 28] for summary judgment is DENIED. The parties are directed to submit a joint status memorandum and proposed scheduling order on or before June 15, 2018 presenting a process to be followed to bring this case to

final judgment.  A scheduling conference is hereby set for June

19, 2018 at 2:00 p.m. in Courtroom 1.



/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE